# Kinnear *v.* Scenic Railways Company of America, Appellant.

*Trade fixtures—Landlord and tenant—Mortgage—Conflicting claims of lessee and mortgagee.*

1. The intention which controls and determines whether or not a chattel is annexed and becomes a part of the realty is the intention the parties had at the time it was placed on the property.

2. A corporation organized for the purpose of maintaining a park for the amusement of the public purchased land for the purpose of its organization, and gave a mortgage for the balance of the unpaid purchase money. Subsequent to the date of the mortgage the park company leased a small portion of the land, including a theater building, then in existence, to a lessee for the purpose of constructing thereon and operating a scenic railway. The consideration was a percentage of the gross

receipts derived from the railway. The lease provided that the park company at its option might appoint a cashier to receive all moneys from the sale of tickets; that the plant was at all times to be subject to the inspection and approval of the park company, that the buildings and appliances were to revert to the park company upon the termination of the lease; and that the park company should have the right to buy the leasehold with all buildings and appliances erected and maintained thereon at the end of any park season during the term of the lease. The railway was duly constructed with uprights and supports imbedded in the earth to a distance below the frost line, and with platforms attached to the theater, which was used as a ticket office and a station. While the railway could be taken down and removed without serious injury to the materials, it appeared that the removal of such structures was of infrequent occurrence. After the railway had been operated for two seasons the holder of the mortgage foreclosed, and bought in the park company's land. *Held*, that as between the purchaser at the foreclosure sale and the lessee, the railway was the property of the former, inasmuch as it was the intention of both parties at the time of the construction of the device, that it was to be placed on the lessor's realty as a permanent improvement.

3. The same rule as to ownership of property and chattels annexed to realty prevails between a mortgagor and mortgagee as between a grantor and grantee and in either case it operates more strongly in favor of the mortgagee or grantee than the landlord where his title is assailed by a lessee.

ELKIN, J., dissents.

Argued Nov. 4, 1908. Appeal, No. 4, Oct. T., 1909, by defendant, from decree of C. P. No. 2, Allegheny Co., July T., 1908, No. 728, on bill in equity in case of James W. Kinnear v. Scenic Railways Company of America. Before FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Bill in equity for an injunction. Before FRAZER, P. J.

The facts are stated in the opinion of the Supreme Court. The court entered a decree:

That the Scenic Railways Company of America, the defendant, its officers, agents, servants and employees be, and they are hereby permanently restrained and enjoined from interfering with or attempting to remove from the property upon which the same is located, heretofore known as Luna Park, all those certain buildings and improvements located on the premises above

described, known as a one-story frame pagoda entrance with 2,500 feet of surface and elevated railway connected therewith, and all machinery, apparatus and appliances in any way connected therewith or forming a part thereof, now or formerly known as the "Leap the Dips" or "Scenic Railway."

*Error assigned* was the decree of the court.

*Richard B. Scandrett,* with him *James E. Barnett* and *S. G. Nolin,* for appellant.—Trade fixtures which a tenant for years puts upon leased premises continue to be his personal chattels and are removable by him at the end of the term unless annexed with a clear intent to make them a part of the realty: Elwes v. Maw, 3 East, 28; Van Ness v. Pacard, 27 U. S. 137; Donnelly v. Frick & Lindsay Co. 207 Pa. 597; Thompson Scenic Ry. Co. v. Young, 90 Maryland, 278 (44 Atl. Repr. 1024).

A tenant's trade fixture, which is his personal property before and after the period of annexation, continues to be his personal property during that period; it does not become during the period of the annexation a part of the realty, leaving the tenant in the meantime merely a right of removal.

If the parties agree that in a certain event or upon the performance of a certain condition it shall become the property of the landlord, the fixture continues in the meantime to be the personal property of the tenant until the event happens or the condition is performed: Lemar v. Miles, 4 Watts, 330; Watts v. Lehman, 107 Pa. 106; Morgan v. Negley, 3 Pitts. Repr. 33.

The intention of the parties as disclosed by the lease was that the property in question, unless purchased in the meantime as provided by the option in the lease, which was not exercised, should remain the personal property of the tenant until the expiration of the seven-year period for which this lease was made: Ashmun v. Williams, 25 Mass. 402; Charlotte Furnace Co. v. Stouffer, 127 Pa. 336.

Where the annexation can be severed without impairing the value of the security for the mortgage debt as it stood before the improvement, the same character is impressed upon the annexation as between the tenant or other person having a pro-

prietary interest in the thing annexed and the mortgagee of the realty as between the tenant or other proprietor and the mortgagor: Hill v. Sewald, 53 Pa. 271; Sanders v. Davis, L. R. 15 Q. B. Div. 218; Campbell v. Roddy, 44 N. J. Eq. 244 (14 Atl. Repr. 279); Fosdick v. Schall, 99 U. S. 235.

*Frank C. Osburn,* with him *Kinnear, McCloskey & Best,* for appellee.—As between the parties in Pennsylvania, and as to all persons claiming under them, both before and after condition broken, a mortgage is a conveyance of a legal title giving the mortgagee immediate right of entry. He is entitled to possession, and if kept out by force can sue in ejectment. If he gets possession there is no remedy known in law by which the mortgagor can regain possession, or sustain any action to regain possession, without payment or offer to pay the mortgage debt, interest and costs: Youngman v. R. R. Co., 65 Pa. 278.

As to all other parties the legal title remains in the mortgagor: Tryon v. Munson, 77 Pa. 250.

The authorities also generally lay down the rule, that inasmuch as the mortgagor cannot confer a greater right upon another than he possesses himself, fixtures annexed by tenant of the mortgagor under a lease executed subsequent to the execution of the mortgage, pass on a foreclosure sale to the purchaser at such sale, and cannot be removed by such tenant: Roberts v. Dauphin Deposit Bank, 19 Pa. 71; Ott v. Sweatman, 166 Pa. 217; Bass Foundry & Machine Works v. Gallentine, 99 Indiana, 525; Nat. Bank of Catasaqua v. North, 160 Pa. 303; Coleman v. Lewis, 27 Pa. 291; Wick v. Bredin, 189 Pa. 83; Gulick v. Heermans, 6 Luz. Leg. Reg. 227; Isman v. Hanscom, 217 Pa. 133; Agnew v. Whitney, 10 Phila. 77; Folsom v. Cook, 115 Pa. 539; Whitney v. Shippen, 89 Pa. 22; Hill v. Sewald, 53 Pa. 271.

As to what fixtures are, is always a mixed question of law and fact. In all the recent cases, the true criterion has been held to be, the intention on the part of the tenant to remove the fixtures during his term, at the time he placed them upon the property: Vail v. Weaver, 132 Pa. 363; Spencer v. Darlington, 74 Pa. 286; Harris v. Kelly, 13 Atl. Repr. 523; Oves v. Ogelsby,

7 Watts, 106; Muehling v. Muehling, 181 Pa. 483; Darrah v. Baird, 101 Pa. 265.

OPINION BY MR. JUSTICE MESTREZAT, January 4, 1909:

A corporation, whose name was subsequently changed to Luna Park Company, was incorporated February 1, 1905, "for the purpose of maintaining and operating a park for the amusement, entertainment and recreation of the public." By deed dated January 18, 1905, the company purchased a tract of land in the thirteenth ward of the city of Pittsburg, containing between sixteen and seventeen acres, on which it erected a number of buildings, improvements and devices, which were used for amusement purposes during the summers of the years 1906, 1907 and 1908. To secure the payment of $75,000, the balance of the unpaid purchase money, the company gave a mortgage on the premises of even date with the deed.

The park company by an agreement dated January 31, 1906, leased to J. A. Miller, acting as agent for the appellant company, for the term of seven years, a small portion of the ground purchased by it as stated above, "including the Japanese theater building now located in said park," for the purpose of constructing thereon and operating a scenic railway, an amusement device generally known as "Leap the Dips." The consideration was twenty-seven and one-half per cent of the gross receipts derived from the operation of the railway, settlements to be made daily. The agreement provided, inter alia, that the park company at its option might appoint a cashier to receive all moneys from sale of tickets; that the plant should at all times be subject to the inspection and approval of the park company; that the buildings and appliances were to revert to the park company upon the termination of the lease; also that the park company should have the right to buy the leasehold, with all the buildings and appliances erected and contained thereon, at the end of any park season during the term of the lease, provided the purchase was made within sixty days from closing date of any park season, with a reduction of ten per cent of the original cost for each season during which the railroad was operated. The railway was duly constructed by Miller and until the season of 1908

was operated by him and the appellant company, to whom the lease was assigned by Miller.

The park company borrowed $70,000 of the Keystone National Bank and secured the payment of it by a second mortgage upon the park property, dated September 5, 1906, and duly recorded. The cashier of the bank knew of the lease to Miller at the time the mortgage was taken, but did not know that it had been assigned to the appellant company.

As found by the trial judge, "Luna Park is an assemblage of amusement places and devices open to the public, which are changed from time to time to meet the desires of the patrons of the park, an admission fee being charged to the park as well as to the different amusements contained within the park."

In a proceeding on the mortgage held by the Keystone National Bank against the park company, the property was sold and purchased by plaintiff, the appellee, and conveyed to him by the sheriff by deed dated March 2, 1908. In a similar proceeding on the purchase money mortgage, the property was also sold and purchased by the appellee, and the sheriff conveyed it to him by deed dated May 4, 1908. The appellee holds the property as agent and trustee for the Keystone National Bank, whose employees and servants have been in possession of the park and all the property since it became the purchaser under the first sale by the sheriff.

The appellant company claiming the right to remove the scenic railway which it erected on the leased premises, the appellee filed this bill to restrain the appellant from interfering with or attempting to remove the buildings and improvements located on the premises, and erected or constructed by the appellant company. The appellee claims that he is the owner of the property by virtue of his purchase in the proceedings on the mortgages, and the appellant company contends that the lease was ended by the foreclosure of the first mortgage and that therefore it has the right to remove the property in dispute as trade fixtures of a tenant.

The court below found all the material facts, and, inter alia, the following: "The Scenic Railway is one of the best patronized and most profitable amusement features of the park. It

is substantially built, with superstructure consisting of uprights and supports imbedded in the earth to a distance below the frost line, and with the platforms attached to the pavilion, or Japanese Theater building, which is used as a ticket office and station for entrance to and exit from the cars. . . . The construction of a scenic railway is such that its superstructure can, without serious injury to the materials used, be taken down and reconstructed in another location. The removal and re-erection of such structures is, however, of infrequent occurrence."

The learned judge held that if the lease had simply given Miller the right to enter upon and erect the scenic railway without any other provisions affecting the question, that the property in dispute might be considered a trade fixture and held to be subject to the law governing such property; but he was of the opinion that the lease determined the rights of the parties and that it "clearly indicates an intention that the railway and its appliances should be permanent fixtures, and remain in the park until the termination of the lease, when they should become the absolute property of the Park Company." He, therefore, held that the title to the property passed to the appellee as purchaser of the land under the mortgages. The injunction was granted as prayed for in the bill, and the defendant has taken this appeal.

We think the learned trial judge was correct in holding that the property in dispute was a part of the realty and passed to the purchaser at the sale made under the proceedings on the mortgage. The character of the property, whether personal or a part of the real estate, must be determined by the covenants contained in the agreement of January 31, 1906. That agreement, read in the light of all the circumstances, leaves no doubt of the intention of the parties as to the character of the property. As observed above, the Luna Park Company was incorporated for the purpose of operating an amusement park. The sixteen acres of land owned by the corporation were purchased to carry out the purpose of the corporation. The object the company had in obtaining title to the land in Pittsburg was to make it a place "for the amusement, entertainment and recreation of the public." The company erected various devices

on the premises for the amusement of the public and has continuously operated the property as a place of amusement since the erection and construction of the buildings.

In view of the purpose for which the charter was obtained by the Luna Park Company and of the fact that the land was purchased by the company to carry out the purpose, there can be no difficulty in determining that under the terms of the lease it was the intention of the lessor and lessee that the scenic railway should be annexed to the real estate and become a permanent improvement in the park. The intention which controls and determines whether or not a chattel is annexed and becomes a part of the realty is the intention the parties had at the time it was placed upon the property: Vail v. Weaver, 132 Pa. 363; Carver v. Gough, 153 Pa. 225.

The lease was for seven years and was "of a space in said park for the purpose of constructing and operating thereon an amusement device." This was the purpose for which the Luna Park Company was chartered and its land was purchased. In leasing this space to Miller, therefore, it was for a purpose to which the lessor was devoting the balance of the park, and instead of the park company erecting the device, it leased the space of ground to Miller for the like purpose of erecting and operating the railway for a limited time. Under the covenants of the lease, the scenic railway was practically under the control of the lessor like the other amusement devices constructed and operated on the park premises. As said by the court in Thompson Scenic Railway Company v. Young, 90 Md. 278: "It (scenic railway) was only available for pleasure resorts and had no general utility." After the lease expired, it could be utilized by the park company in the operation of the park as a place of amusement. By the terms of the lease the railway was attached to and became a part of the Japanese theater building on the park property and owned by the park company. The lessor company had the authority to appoint a cashier to receive all the moneys from the sale of admission tickets to the railway. The railway was at all times subject to inspection and approval of the park company. The consideration to be paid the company was twenty-seven and one-half per cent of

the gross receipts from the operation of the railway, and it was to be paid daily. In addition to these provisions, it is specifically provided in the lease that the buildings and appliances erected by the lessee were to revert to the lessor upon the termination of the lease; and further that the lessor was to have the right to buy the leasehold with the buildings and appliances at the end of any park season during the continuance of the lease by paying ten per cent less than the original cost for each season during which the railway device had been operated. These several provisions of the lease leave no doubt whatever as to the intention of both parties at the time the instrument was executed and the scenic railway was erected on the park premises. The manifest purpose of the lessor was to add another attractive amusement to its park. As we have said, it could have constructed the railway; but it preferred to lease the space of ground and permit the lessee to construct and operate the device for a limited time. Instead of erecting a railway itself and receiving all the receipts from its operation, it gave the lessee the right to construct and operate it by paying the lessor a certain percentage of the receipts. At any time, however, the lessor had the right, by its cashier, to receive all the receipts from the operation of the device, and thereby practically control the financial part of the operation of the railway. As conclusively showing, however, that the improvement was to be permanent, it was agreed that the railway should become the property of the lessor at the termination of the lease. This stipulation, taken in connection with the other provisions of the lease, leaves no doubt of the intention of the parties at the time of the execution of the lease and the construction of the device. If, as claimed by the lessee, the railway was intended to be a trade fixture removable during the term, contrary to the implied covenant that it should remain during the term and the express covenant that it was to revert to the lessor at the close of the term, the parties should have so stipulated in their contract. Presumably the parties intended exactly what they agreed to in the lease. They have there contracted that the device shall revert to the lessor at the end of the lease. Manifestly this stipulation was to enable the

lessor to continue its use on the park premises. The lessor could advantageously utilize it at the very place it was constructed; and while it could be removed by the lessee, yet it would be at a loss to him. There was therefore a substantial reason why the device should remain on the premises at the place it was constructed and this must be considered in determining the intention of the parties as disclosed by their agreement.

The leasehold could be purchased by the lessor at the end of any park season during the continuance of the lease. This does not show, however, that it was not the intention of the parties that the railway should not permanently remain in the park. It is simply a stipulation in the agreement that the leasehold acquired by the lessee shall become the property of the lessor by the payment of the stipulated sum. The lessor could avail itself of this option, or it could await the termination of the lease and pay nothing. The lessee could not remove the device on failure of the lessor to exercise the option. The lessee company was compelled to allow it to remain on the park premises whether the lessor exercised its option to purchase or not. An execution creditor of the lessee could not have levied upon and sold the railway, nor could the purchaser at such sale have removed it. That manifestly would have been a violation of the contract between the parties. The railway was not subject to the control of the lessee or its creditors to the extent of permitting its removal from the lessor's premises during a continuance of the term. The lessor had a right not only to have the railway remain on the park premises, but also to have it operated thereon so that it could receive its per cent of gross receipts during the lease. The removal of the property by the lessee or its creditors would have been a deprivation of this right which, on application of the lessor, the courts would prevent. The clear and undoubted purpose, therefore, was that the railway should remain on the park premises during the continuance of the lease and thereafter revert to the lessor.

As the agreement between the parties fixes the character of the improvement, we need not determine whether the device is a trade fixture and would have been removable during the

term in the absence of an agreement declaring it to have been permanently annexed to the real estate. The learned counsel for the appellant company has furnished us an exhaustive brief, but none of the cases control this case in its favor. In the cases cited by the counsel in which there was an agreement, the court construed the contract to authorize the removal of the improvement. In Thompson Scenic Railway Company v. Young, 90 Md. 278, cited by the appellant, it was specifically provided that the right and possession of the property should remain in the contractor (the claimant) and should not vest in the tenant for whom it was constructed until it was paid for. Hence it was held that on failure of the tenant without having paid for the railway, it did not become a part of the realty and belong to the landlord. Hill v. Sewald, 53 Pa. 271, was simply a hiring of chattels and there was no intention of annexing them to the freehold. In Lemar v. Miles, 4 Watts, 330, the fixture was held, under the contract, to be personal property, and that the event had not occurred which was to make it the property of the landlord. This case was followed in Watts v. Lehman, 107 Pa. 106. Both cases were between landlord and tenant. But even in such cases it has been distinctly ruled by this court in Harris v. Kelley, 10 Sadler, 185, that a creditor could not seize and sell the personal property placed by a tenant on leased property under a lease containing a clause providing that "all improvements erected or placed in said building to be and remain at the expiration of this lease the property of the lessor."

But the case in hand is not between landlord and tenant, but between one who holds title to the premises by virtue of a sale on a judgment obtained on a mortgage given prior to the lease, and a lessee of the mortgagor. We have been referred to no case which rules that the property in question would be held to be a trade fixture with the title in the lessee as against a prior mortgagee under the circumstances of this case. The same rule as to ownership of property in chattels annexed to realty prevails between a mortgagor and mortgagee as between a grantor and grantee: Gunderson v. Swarthout (Wis), 76 Am. St. Rep. 860; McFadden v. Allen, 134 N. Y. 489; and in either case it

operates more strongly in favor of the mortgagee or grantee than the landlord where his title is assailed by a lessee.

We are clear that under the contract in this case the scenic railway was placed on the lessor's realty as a permanent improvement, and that such was the intention of both parties at the time of the construction of the device. The parties might have provided otherwise but they did not do so, and in the language of Chief Justice Paxson in Carver v. Gough, 153 Pa. 225, 229: "While it may be a hardship to the appellant to deny his right to remove the buildings, we cannot see our way clear to come to any other conclusion consistent with the recognized rules of law."

The decree of the court below is affirmed.

Elkin, J., dissents.