533 A.2d 179

Canon-McMillan School District, Appellant *v.* Teddy S. Bioni, Appellee.

Argued May 20, 1987, before President Judge CRUMLISH, JR., Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

586

W. Patrick Boyer, with him, John C. Pettit, Pettit and Johnson, for appellant.

Paul W. Stefano, with him, Samuel Y. Stroh, for appellee.

OPINION BY JUDGE PALLADINO, October 30, 1987:

Canon-McMillan School District (Appellant) appeals an order of the Court of Common Pleas of Washington County denying its motion for post trial relief.

In March, 1979, Teddy S. Bioni sustained an injury to his left eye while performing an in-class assignment, which involved the use of a wood lathe, for his "Industrial Materials" course at Canon-McMillan High School. The injury occurred when a laminated wooden bowl Bioni was sanding on the lathe broke apart. Bioni filed a trespass action against Appellant in 1981, alleging his eye injury was the result of Appellant's negligence in respect to the wood lathe. Appellant, in its answer and new matter, pleaded the affirmative defense of governmental immunity under the Political Subdivision Tort Claims Act (Act).[1] Bioni answered, denying Appellant was protected by the Act but did not specify under what exception his action fell.

In November, 1983, Appellant filed a motion for summary judgment in which it contended that, as a matter of law, Bioni's action against it was barred by sec-

[1] Act of November 26, 1978, P.L. 1399, as amended, formerly 53 P.S. §§5311.101-5311.803, repealed and substantially reenacted by the Act of October 5, 1980, P.L. 693, as amended, 42 Pa. C. S. §§8541-64.

tion 201 of the Act[2] because the action did not fall within any of the eight exceptions to governmental immunity contained in section 202(b) of the Act.[3] The hearing on this motion was continued until discovery was completed. On October 4, 1985, the trial court denied the summary judgment motion.

A jury trial was held from October 15 to 18, 1985. At the end of Bioni's presentation of evidence, Appellant made a motion for a compulsory nonsuit which was denied. Appellant also moved for a directed verdict at the conclusion of the trial, which was denied. Appellant's basis for both motions was that the lathe was personal property rather than realty, and, therefore, Appellant was immune from suit. The jury returned a verdict for

---

[2] 53 P.S. §5311.201. This section provided:

Except as otherwise provided in this act, no political subdivision shall be liable for any damages on account of any injury to a person or property caused by any act or omission of the political subdivision or an employee thereof or any other person.

The substantially similar provision currently in effect is found at 42 Pa. C. S. §8541.

[3] 53 P.S. §5311-202. This section provided for the following eight exceptions to immunity:

(1) Operation of a motor vehicle in possession or control of the political subdivision.

(2) Care, custody or control of personal property of others.

(3) Care, custody or control of real property.

(4) Dangerous condition of traffic lights, lights or other traffic controls, street lights or street lighting systems or trees.

(5) Dangerous condition of the facilities of steam, sewer, water, gas and electric systems.

(6) Dangerous condition of streets.

(7) Dangerous condition of sidewalks.

(8) Care, custody or control of animals.

The substantially similar exceptions currently in effect are found at 42 Pa. C. S. §8542(b).

Bioni against Appellant in the amount of $150,000. Appellant filed a motion for post trial relief, requesting the trial court to enter judgment notwithstanding the verdict (JNOV) for it because, as a matter of law, it was immune from suit. Alternatively, Appellant sought a new trial.

Subsequently, Bioni filed a motion, pursuant to Pa. R.C.P. No. 238,[4] to have delay damages of $66,495 added to the verdict. The trial court granted this motion. Appellant then filed a supplement to its post trial relief motion, contending the delay damages were prejudgment interest and, therefore, barred pursuant to section 404 of the Act.[5]

Argument on Appellant's post trial relief motion was held before an en banc court on June 5, 1986. On June 27, 1986, the en banc court denied Appellant's motion and directed judgment on the verdict, as molded by the trial court, be entered in the amount of $216,495. Appellant filed a timely notice of appeal to this court.

Our scope of review of appeals from the refusal to enter JNOV or grant a new trial is limited to determining if the trial court committed an abuse of discretion. *Beechwoods Flying Service v. Hamilton Contracting Corp.*, 317 Pa. Superior Ct. 513, 464 A.2d 440 (1983) *aff'd*. 504 Pa. 618, 476 A.2d 350 (1984). JNOV is an extreme remedy and should be entered only in a clear

---

[4] Rule 238 provides for delay damages, at a rate of 10% per annum, to be computed from the date the initial complaint was filed until the date of the verdict in actions for money damages for bodily injury unless the defendant has made an unaccepted settlement offer and the verdict is not more than 125% of the offer.

[5] 53 P.S. §5311.404. This section states: "Prejudgment interest. No interest shall accrue prior to any entry of judgment." Section 404 was not reenacted as a distinct section by the Act of October 5, 1980. An identical prohibition of prejudgment interest does appear in the preamble to the codified sections of the Act. *See* section 333 of the Act of October 5, 1980.

case after the evidence and all reasonable inferences therefrom have been evaluated in a light most favorable to the verdict winner. *Id.* In reviewing the refusal to grant a new trial, the appellate court considers all the evidence and is not required to consider it in the light most favorable to the verdict winner. *Ditz v. Marshall,* 259 Pa. Superior Ct. 31, 393 A.2d 701 (1978). If the verdict is clearly against the weight of the evidence, a new trial is compelled. *Id.*

Appellant makes the following contentions before us: (1) the governmental immunity provided by section 201 of the Act bars this action because the facts of the case do not bring the action within any of the eight exceptions to immunity provided by section 202 of the Act; (2) prejudicial error was committed by the trial judge in admitting evidence and in charging the jury; and (3) the delay damages provided for in Pa. R.C.P. No. 238 may not be assessed against it pursuant to section 404 of the Act. For the reasons which follow, we conclude that the weight of the evidence does not support a finding that Appellant's actions fell within an exception to government immunity and a new trial is required. Accordingly, we will not consider Appellant's second and third contentions.

The incident which gave rise to this action occurred while the Act was in effect and, therefore, the Appellant's immunity claim must be considered under its terms. *Wimbish v. School District of Penn Hills,* 59 Pa. Commonwealth Ct. 620, 622, n. 2, 430 A.2d 710, 711 n. 2 (1981). Since the sections of the Act we are concerned with, sections 201 and 202, are substantially indistinguishable from those which are currently in effect, 42 Pa. C. S. §§8541 and 8542, cases dealing with 42 Pa. C. S. §§8541 and 8542 will be referenced in the determination of this case. *See Vann v. Board of Education,*

*School District of Philadelphia,* 76 Pa. Commonwealth Ct. 604, 464 A.2d 684 (1983).

Section 201 of the Act states: "Except as otherwise provided in this act, no political subdivision shall be liable for any damages on account of any injury to a person or property caused by any act or omission of the political subdivision or an employee thereof or any other person." In section 202 of the Act, the General Assembly set forth eight activities which may impose liability on a political subdivision if undertaken by a political subdivision or its employees.[6]

While Bioni did not plead the exception to immunity under which he was pursuing his action,[7] he argues in his brief that the facts place the action within the "real property" exception, section 202(b)(3) of the Act. This subsection provides for the possible imposition of liability for acts concerning:

> [t]he care, custody or control of real property in the possession of the political subdivision, except that the political subdivision shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the political subdivision. As used in this paragraph, 'real property' shall not include trees, streets, sidewalks, traffic signs, lights and other traffic controls, street lights and street lighting systems and facilities of steam, sewer, water, gas and electric systems

---

[6] Liability will only be imposed when undertaking these activities if the conditions set forth in section 201(a) of the Act, 53 P.S. §5311.201(a), are met.

[7] While a plaintiff need not plead the exception to immunity under which he intends to proceed in his complaint, it should be included in his "answer" to the defendant's averment of immunity in the defendant's answer and new matter.

owned by the political subdivision and located within rights of way.

Bioni maintains that the actions of Appellant with respect to the care, custody and control of its wood lathe fall within the real property exception. Appellant, throughout this litigation, has argued that the wood lathe is personal property.

Appellant initially argues that the uncontested facts in this case establish that the lathe was personalty and that the trial court should have decided this as a matter of law instead of submitting it to the jury. To determine the propriety of allowing the jury to determine whether the wood lathe was personal or real property, and therefore to decide the immunity issue, it is necessary to examine the cases which have dealt with a contention that personal property has been converted into real property so as to bring an action within the real property exception to immunity.

In *Brown v. Quaker Valley School District*, 86 Pa. Commonwealth Ct. 496, 486 A.2d 526 (1984), Brown, who had been injured during a physical education class while using a spring board and vaulting horse, claimed that the spring board and vaulting horse were real property. This court, in affirming the trial court's grant of the school district's motion for summary judgment, stated:

> The spring board and vaulting horse are items of movable equipment, not fixtures, as they are not permanently placed at the school nor essential for its operation. . . . Accordingly, that equipment is not considered a part of real property. Therefore, the care, custody or control of real property exception to governmental immunity does not apply.

*Id.* at 498-99, 486 A.2d at 528.

In *Beardell v. Western Wayne School District*, 91 Pa. Commonwealth Ct. 348, 496 A.2d 1373 (1985), the

property at issue was the second base bag on the school district's baseball field. The trial court had granted the school district's motion for summary judgment at the close of the pleadings and denied Beardell leave to amend based on its conclusion that the second base bag was personalty as a matter of law. This court held "that a determination of whether or not a chattel or article of property has become realty involves factual considerations: i.e. how was the chattel annexed to the property and what was the intent of the parties at the time of annexation." *Id.* at 354, 496 A.2d at 1376. The court then reversed the trial court's grant of summary judgment and denial of leave to amend and remanded for further proceedings.

*Beardell* is distinguished from *Brown* by the presence of an allegation in *Beardell* that the second base bag was annexed to the realty. In reaching its decision in *Beardell,* this court relied on the following dissertation on real and personal property by the Pennsylvania Supreme Court:

> Chattels used in connection with real estate are of three classes: First, those which are manifestly furniture, as distinguished from improvements, and not peculiarly fitted to the property with which they are used; these always remain personalty. . . . Second, those which are so annexed to the property, that they cannot be removed without material injury to the real estate or to themselves; these are realty. . . . Third, those which, although physically connected with the real estate, are so affixed as to be removable without destroying or materially injuring the chattels themselves, or the property to which they are annexed; these become part of the realty or remain personalty, depending on the intention of the parties at the time of annexation. . . .

*Id.* at 353-54, 496 A.2d 1376 (quoting *Clayton v. Lienhard,* 312 Pa. 433, 436-37, 167 A. 321, 322 (1933)).[8]

In *McCloskey v. Abington School District,* 101 Pa. Commonwealth Ct. 110, 515 A.2d 642 (1986), this court dealt with the issue of whether a set of gymnastic rings attached to the roof by ceiling clamps, removable without material damage to the realty or the rings, could be considered real estate for purposes of the real property exception to governmental immunity. The court reversed the trial court's grant of summary judgment on the basis that the determinative issue was the "intent of the parties" and intent was a matter for the fact finder. *Id.* at 115, 515 A.2d at 645.

From these cases it becomes apparent that whether a particular piece of personal property constitutes real property for purposes of the real property exception to government immunity is not necessarily a question of law. The first determination to be made is into which of the three categories of chattel it falls. If the chattel is annexed, or should be for its proper use, to real property in the possession of the political subdivision, it is automatically excluded from the first category and requires factual determinations to resolve its status. If there are undisputable facts showing that material damage will result to the chattel or the real estate if the chattel is removed, the chattel falls in category two,[9] and it will be considered a fixture *i.e.* part of the real

---

[8] The *Clayton* case dealt with the propriety of a mechanic's lien on a sprinkler system installed in a building when it was built.

[9] The damage does not necessarily have to be physical damage. Our Supreme Court in *Central Lithograph Co. v. Eatmor Chocolate Co.,* 316 Pa. 300, 175 A. 697 (1934), found a material injury had been caused to the realty by the removal of certain personalty (candy making equipment) because the manufacturing plant's *value* would be materially diminished without the equipment.

property it is attached to. The difficult determination involves those chattels which fall into category three. The resolution of whether category three chattels have become realty or remained personalty depends on the intention of the parties at the time of annexation.

The undisputed facts in this case are that the wood lathe (1) was cast iron and weighed approximately 800 pounds, (2) had holes in each of its four feet for attachment but had not been attached to the floor, (3) was connected with a flexible electrical wire to an electrial duct on the wall at the time of the accident, (4) had been moved to a different room at least once, and (5) had been moved short distances within the classroom for cleaning, coursework, and classroom redesign. We believe these facts place the wood lathe into the third category. This makes a determination of the school district's intent necessary and, as was concluded in *McCloskey,* that is a matter for the factfinder rather than a matter of law for the court. Accordingly, the trial court did not err in submitting the question of whether the wood lathe was personalty or realty.

Appellant also argues that Bioni presented *no* evidence to counter the testimony of its personnel that Appellant's intention when it placed the lathe in operation was not to permanently annex it to the realty but "to create a 'flexible' situation; a situation wherein the lathe was readily and easily moveable." Appellant's brief at 18. Therefore, there was no evidence on which the jury could have made a decision that the lathe was realty. In determining the intent at the time of installation, " 'it is not so much what a particular party intended his legal rights to be, as it is what intended use of the property was manifested by the conduct of the parties.' " *McCloskey,* 101 Pa. Commonwealth Ct. at 114, 515 A.2d at 644 (quoting Clothier, *The Law of Fixtures in Pennsylvania,* 32 PA.B.Q. 66, 66-67 (1960-61)). We can

not, in examining the evidence and all reasonable inference from it, *in the light most favorable to Bioni,* conclude that there is nothing on which a jury could find Appellant intended the wood lathe to be realty when it was installed. Therefore, we may not reverse the refusal to enter JNOV for the Appellant.

However, we do believe the verdict was contrary to the weight of evidence and that the case must be remanded for a new trial. To explain how we reached this conclusion, we find it necessary to discuss what must be considered in determining the annexor's intention for using the personalty in connection with the realty prior to detailing the evidence which convinces us the intent of the school district was that the wood lathe remain personalty.

Items of personal property used in connection with real estate and determined to be part of that real estate are known as fixtures. The decision on when an article of personal property will be considered a fixture is controlled by the law of fixtures. The general test used in determining when an item of personalty is a fixture contains three components which are: (1) the relative permanence of the attachment of the object to the realty; (2) the adaptation of the chattel to the use being made of the realty; and (3) the intention of the interested parties to make a permanent addition to the realty. Note, *The Definition of Fixture in Article 9 of the U.C.C.,* 41 CASE W. RES. 841, 849-50 (1981). These are the criteria established in Pennsylvania. *See Justice v. Nesquehoning Valley Railroad Co.,* 87 Pa. 28 (1878). As the permanence of the attachment and the need of the chattel to the use of the realty becomes less obvious the importance of the intention component increases.

There is no clear cut test for determining intent. A good description of what is involved is contained in the following:

> The parties' intentions are to be determined from their overt action and objective manifestations. Thus intentions may well be inferred from the nature of the article annexed, the status of the party making the annexation, the structure or mode of the annexation, and the purpose or use of the chattel annexed. Neither the mode of annexation nor the use of the chattel is conclusive as to intention, however.

16 P.L.E. *Fixtures* §1 (1959). Accordingly, in determining intention, we conclude that the factfinder, at a minimum, must consider and weigh: (1) the nature of the personalty involved; (2) the status of the possessor of the personalty in respect to the realty; (3) the manner of annexation of the personalty; and (4) the use to which the personalty is put. The intent component includes evaluation of the first two components of the general test and therefore tends to be the most important component. *See* Squillante, *The Law of Fixtures: Common Law and the U.C.C.* (pt. 1), 89 Comm. L.J. 501, 502 (1984). A brief explanation of these factors follows.

The nature of the personalty involves an inquiry of whether the item is more like what is traditionally considered personalty (a sofa) or real estate (a building). It also involves a consideration of how the parties involved treat the item. *See id.* at 506. The status of the annexor to the realty involves a determination of whether the annexor is a mortgagor, lessee, lessor, owner, secured creditor, etc. *See id.* at 506-07. The status of the annexor is dependent on the nature of the litigation and may vary depending on the relationship of the parties. *See* 16 P.L.E. *Fixtures* §4 (1959). For example, in landlord/tenant litigation, the chattel is more likely to be a fixture if the landlord was the annexor than if the tenant was. *Id.* The manner of annexation varies from gravity to being built into the wall, and the permanency of the

attachment is not controlling as long as the item can be removed without physically damaging or diminishing the value of the item or the realty. *See* Squillante at 503-04. The use to which the personalty is put is primarily a consideration of the purpose for which the item was annexed to the realty. *See id.* at 505.

To illustrate the interplay of these factors consider a conventional electric stove. If found in a home, put there by the occupant, annexed only by a cord, and used only for meals, it clearly remains personalty. However, if found in an apartment and put there by the landlord as part of the built-ins for the purpose of making the apartment more attractive to tenants, it is most likely a fixture.

Fixture law has primarily been used in determining private property rights between parties with the status of lessor and lessee, vendor and vendee, and mortgagor and mortgagee.[10] It has also been used in determining the propriety of the valuation of property for real estate purposes. *See United Laundries v. Board of Property Assessment,* 359 Pa. 195, 58 A.2d 833 (1948). Currently, fixture law plays an important part in bankruptcy litigation because the Uniform Commercial Code leaves the definition of fixture, in determining the priority of creditors, to each state's common law of fixtures. U.C.C. §9-313(1)(a) (1972).[11]

---

[10] For examples of cases in these categories, see *Cattie v. Joseph P. Cattie & Bros., Inc.,* 403 Pa. 161, 168 A.2d 313 (1961) (lessor/lessee); *First National Bank of Mount Carmel v. Reichneder,* 371 Pa. 463, 91 A.2d 277 (1952) (mortgagor/mortgagee); *Kinnear v. Scenic Rys. Co. of America,* 223 Pa. 390, 72 A. 808 (1909) (vendor/vendee).

[11] In Pennsylvania, this section can be found at 13 Pa. C. S. §9313(a) and states:

'**Fixtures.**' Goods are 'fixtures' when they become related to particular real estate that an interest in them arises under real estate law.

These cases are of minimal use in the situation which confronts us here. While the discussions of the general rule provide guidance, the application of the law in those cases does not because they dealt with *private* property interests. Here we are determining whether suit, alleging negligent conduct in the care, custody or control of a chattel used in connection with realty, should be permitted against a governmental agency. In our analysis of the evidence in relation to the four intention factors which follows, we will explain how this affects our decision.

### (1)  The Nature of the Wood Lathe

There is nothing inherent in this 800 lb. cast iron wood lathe which, by itself, would suggest it is more like realty than personalty. Appellant testified that the lathe had been moved to different classrooms within the school and within the classroom itself. N.T. at 179, 183.

### (2)  Status of the Annexor in Respect to the Realty

The status of the annexor in respect to the realty by necessity takes on a different connotation when the real property exception to governmental immunity is involved. The exception requires that the real property involved be owned by the political subdivision. Therefore, to even reach the question of whether a chattel is a fixture and considered realty, the annexor must own both the chattel and the realty. We believe, in this situation, status must be interpreted to refer to the status of the political subdivision involved. Here the political subdivision is a school district which is required to provide a free education, designed to serve the needs of

---

For an example of the application of Pennsylvania fixture law in a bankruptcy case, see *In re Hess*, 61 Bankr. 247 (Bankr. W.D. Pa. 1986).

the Commonwealth, to children between the ages of 6 and 21 who reside in the district. *See* Pa. Const. art. 3, §14; section 1301 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, 24 P.S. §13-1301.

### (3) The Manner of Annexation

The evidence reveals that the wood lathe was hardwired to the wall of the classroom at the time of the accident. N.T. at 89. It is presently hardwired but not in the same manner. N.T. at 92. When the lathe was initially installed in the school it was plugged into a conventional 220 outlet. N.T. at 184.

Evidence of the normal mode of attachment of wood lathes revealed that for safety purposes in industry they are required to be lagged to the floor, N.T. at 117, but the requirement does not apply to schools. N.T. at 118. The manufacturer's manual for this particular lathe states it should not be tightly bolted to the floor if it is to operate properly. N.T. at 202.

### (4) The Use for Which the Lathe was Installed

The wood lathe was used in the high school by high school students in the industrial materials courses offered in the Appellant's industrial arts program. N.T. at 175, 177, 197. Appellant's witness testified the wood lathe was not attached more permanently because flexibility was needed to accommodate the changing needs of the school and the industrial arts program. N.T. at 178-81. Appellant's witness described how Appellant's industrial arts program was modified at the direction of the Department of Education to accommodate an exploratory program. N.T. at 176, 184-85.

### CONCLUSION

We believe that in light of Appellant's status and its need for flexibility to accommodate changing education-

al needs, it had no intention of making the wood lathe a part of the realty. The evidence that the industrial arts program has modified, that the wood lathe is not required to be bolted to be used and was not attached to the realty by anything more than gravity and an electrical wire, and that it had been moved to a different classroom within the building all support a determination that the chattel was not intended to be a fixture. If the wood lathe retains its chattel identity, action against Appellant is barred by governmental immunity. We conclude the verdict must therefore be reversed and a new trial held.

Because the issue of immunity involves consideration of the actual and the proper attachment of the wood lathe for use and the issue of negligence involves consideration of actual and proper use of the wood lathe for safety, to avoid prejudice, we direct the issue of immunity to be decided prior to trial on the merits.

## ORDER

AND NOW, October 30, 1987, the order of the Court of Common Pleas of Washington County in the above-captioned case denying post trial relief is reversed and a new trial ordered. The case is remanded for further proceedings consistent with this opinion.

Jurisdiction relinquished.

Judge COLINS dissents.

---

DISSENTING OPINION BY PRESIDENT JUDGE CRUMLISH, JR.:

I respectfully dissent.

The majority's conclusion that the verdict is contrary to the weight of the evidence is an arrogation of the jury's factfinding function. It must be emphasized that a new trial is to be ordered only where the verdict is so contrary to the weight of the evidence as to shock one's

sense of justice. Merely conflicting evidence is not sufficient. *Kopeika v. Medical Services Association,* 347 Pa. Superior Ct. 500, 500 A.2d 1168 (1985).

As conceded by the majority, the issue of whether the lathe was realty or personalty was a factual question properly submitted to the jury. The majority has chosen, however, to give controlling weight to certain testimony indicating the School District's intent to maintain the lathe as personalty. Specifically, the majority cites the School District's flexibility in accommodating changing educational needs and the fact that the lathe was not bolted to the floor and had been moved.

Conversely, the jury relied on the lathe's sheer weight, the relative permanence of its electrical connections, and testimony that the lathe had been moved only once in six years, to conclude that it had become a permanent fixture for governmental immunity purposes. I believe, therefore, that the jury's verdict is amply supported by the evidence and that the repetition of a new trial is unnecessary.

Judge DOYLE joins in this dissent.